# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MUNICIPAL AUTHORITY** | : | **CIVIL ACTION NO. 2:16-CV-422** |
| **OF WESTMORELAND COUNTY,** | : | |
| **on behalf of itself and all others** | : | **(Chief Judge Conner)** |
| **similarly situated,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CNX GAS COMPANY, L.L.C. and** | : | |
| **NOBLE ENERGY, INC.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Municipal Authority of Westmoreland County ("MAWC") owns approximately 2,255 acres of land in Western Pennsylvania that it has leased for oil and gas production. The current lessees are defendants CNX Gas Company, L.L.C. ("CNX") and Noble Energy, Inc. ("Noble"). MAWC contends that CNX and Noble (collectively, "lessees") have breached the terms of their contract with MAWC and tortiously converted portions of MAWC's royalty payments. MAWC filed the instant putative class action on behalf of itself and other similarly situated leaseholders. Lessees move for summary judgment on all claims against them. (Docs. 119, 128). MAWC moves for partial summary judgment. (Doc. 124). We will deny MAWC's motion for partial summary judgment and we will grant in part and deny in part lessees' motions.

## I.    Factual Background and Procedural History[1]

### A.    The Lease and Assignments

In January 2002, MAWC entered into an oil and gas lease (the "Lease") with

Dominion Exploration & Production, Inc. ("Dominion") for gas production on

approximately 2,255 acres MAWC owns in western Pennsylvania.  (Doc. 131 ¶ 1).

Dominion drilled and operated shallow, conventional wells on the leased property

from 2002 until 2010.  (Id. ¶¶ 2-3; Doc. 121 ¶ 17).  Dominion merged with CONSOL

Gas Company ("CONSOL Gas") in April 2010 and assigned the Lease to CONSOL

Gas as part of the purchase and sale agreement.  (Doc. 131 ¶ 3; Doc. 126 ¶ 5).

In January 2011, CONSOL Gas merged with CNX, leaving CNX as the

surviving business entity and sole lessee.  (Doc. 131 ¶ 4; Doc. 126 ¶ 8).  CNX

expanded gas operations under the Lease by drilling two unconventional,

---

[1] Local Rule 56 requires that a motion for summary judgment pursuant to
Federal Rule of Civil Procedure 56 be supported by a "separately filed concise
statement setting forth the facts essential for the Court to decide the motion for
summary judgment, which the moving party contends are undisputed and
material."  LOCAL RULE OF COURT 56(B)(1).  A party opposing a motion for summary
judgment must file a separate statement of material facts, responding to the
numbered paragraphs set forth in the movant's statement and identifying genuine
issues for trial.  See LOCAL RULE OF COURT 56(C)(1)(a)-(b).  The opposing party may
also "set[] forth in separately numbered paragraphs any other material facts that
are allegedly at issue."  LOCAL RULE OF COURT 56(C)(1)(c).  Unless otherwise noted,
the factual background herein derives from the parties' Local Rule 56 statements of
material facts and responses thereto.  (See Docs. 121, 126, 131, 141, 143, 148, 151,
152, 155).  To the extent the parties' statements are undisputed or supported by
uncontroverted record evidence, we cite directly to the Local Rule 56 statements.

horizontal wells on the leased property in the Marcellus Shale Formation.[2]  (Doc. 131 ¶ 7, Doc. 143 ¶ 7; Doc. 121 ¶ 17).  CNX produced gas on the Lease property as the sole lessee from January 2011 to the end of September 2011.  (Doc. 126 ¶ 11).

On September 30, 2011, CNX entered into a joint operating agreement with Noble, whereby CNX assigned, *inter alia*, a 50 percent working interest in the Lease.  (Id. ¶ 12).  Pursuant to the joint operating agreement, CNX and Noble were equally responsible for marketing, sales, and payment of royalties under the Lease. (Id. ¶ 13).  Noble, however, did not begin to market or sell gas or pay royalties under the Lease until November 2012; rather, from October 2011 to November 2012, CNX alone continued to market, sell, and pay all royalties to MAWC for the gas produced. (Doc. 148 at 3 ¶ 13; Doc. 151 ¶ 13; Doc. 125 at 6 n.1).  The joint operating agreement between CNX and Noble was terminated in late 2016, leaving CNX as the sole lessee beginning in January 2017.  (Doc. 126 ¶ 14).

**B.     Assessment of Post-Production Costs**

Costs associated with bringing natural gas to market after it has been removed from the ground (*i.e.*, from "wellhead" to point of sale) are referred to in industry vernacular as "post-production costs."  See Kilmer v. Elexco Land Servs., Inc., 990 A.2d 1147, 1149 & n.2 (Pa. 2010); (Doc. 125 at 11; Doc. 147 at 5).  These costs frequently include gathering, compression, processing, dehydration, treatment, and

---

[2] The Marcellus Shale Formation is a region of gas-rich shale that spans more than 100,000 square miles across Ohio, Maryland, West Virginia, Pennsylvania, and New York.  Butler v. Powers Estate *ex rel.* Warren, 65 A.3d 885, 886 n.1 (Pa. 2013) (citation omitted).

transportation of gas. (Doc. 50 ¶ 9; Doc. 54 ¶ 9); <u>see</u> <u>also</u> <u>Kilmer</u>, 990 A.2d at 1149-50 & n.3. The parties agree that the Lease, as written, ordinarily would permit lessees to deduct post-production costs from royalties owed to MAWC. (Doc. 121 ¶ 4; Doc. 141 ¶ 4; Doc. 148 at 12 ¶ 1; Doc. 152 ¶ 1; Doc. 125 at 13; Doc. 142 at 7).

During the eight years that Dominion extracted gas and paid MAWC royalties under the Lease, Dominion did not deduct any post-production costs. (Doc. 126 ¶ 59; Doc. 127, Ex. 3 (Dominion royalty statements)). The parties disagree about the type and amount of post-production costs that Dominion may have incurred. (Doc. 148 at 9-10 ¶ 59; Doc. 151 ¶ 59). However, the deposition testimony of Jason Mumford ("Mumford"), the Assistant Corporate Controller for CONSOL Energy, Inc. ("CONSOL Energy"), clearly indicates that post-production costs were incurred but not passed on to MAWC. (Doc. 126 ¶¶ 59-61; Doc. 127, Ex. 2, Mumford Dep. 72:9-73:18, 78:24-81:8, 85:2-17, 92:5-10, 132:11-23).[3]

The same is true for the period that CONSOL Gas was the sole lessee— approximately May 2010 through December 2010. It is undisputed that CONSOL Gas did not deduct any post-production costs from MAWC's royalties. (Doc. 126 ¶ 62; Doc. 148 at 10-11 ¶ 62; Doc. 127-1 Ex. 5 (CONSOL Gas royalty statements)). Lessees disagree about whether CONSOL Gas incurred post-production costs every

---

[3] Deposition transcripts have been filed by the parties at numerous, separate docket entries. We will cite to full deposition transcripts as "[Name] Dep.," without repeating the docket entry citation *passim*. We employ this citation convention for any full deposition transcripts cited throughout this memorandum. To the extent partial deposition transcripts are cited, we will retain docket entry citations for ease of location.

month and whether those costs were *de minimis*. (Doc. 148 at 10-11 ¶ 62; Doc. 151 ¶ 62). But the record is clear that CONSOL Gas incurred some post-production costs that were not charged to MAWC. (Doc. 127-2, Ex. 17 at 2-3 (CNX answer to Interrogatory No. 2(a)); Mumford Dep. 33:7-51:17, 108:11-117:23).

The non-deduction of post-production costs continued for nine months into CNX's tenure as lessee. (Doc. 126 ¶¶ 63-65). Beginning with its November 2011 royalty statement for October 2011 gas production, CNX began to charge MAWC for its *pro rata* share of post-production costs. (Id. ¶ 66; Doc. 148 at 11 ¶ 66). When Noble began marketing and selling gas under the Lease and paying its proportionate share of royalties to MAWC, it too charged MAWC post-production costs. (Doc. 126 ¶ 67). MAWC asserts that from the time lessees began charging these costs until the end of 2015, lessees have deducted over $3.5 million from its royalties. (Doc. 126 ¶ 67; Doc. 50 ¶ 32; Doc. 1 ¶ 22).

### C.    Procedural History

MAWC commenced this action in state court in February 2016. CNX, with Noble's consent, removed the case to this court. In its amended complaint, MAWC asserts claims for breach of contract and conversion on its own behalf against CNX and Noble. MAWC also seeks class certification under Federal Rule of Civil Procedure 23 for similarly situated oil and gas leaseholders. Discovery has been bifurcated at the parties' agreement: the parties have completed discovery on the merits of MAWC's claims; class certification discovery is deferred until after resolution of dispositive motions on those claims. (See Doc. 52 at 4 ¶ 9(d); Doc. 171-1 at 16-17). CNX and Noble move for summary judgment on all claims against them.

MAWC moves for summary judgment on its breach of contract claims (Counts I, II, IV, and V of the amended complaint), and as to damages against Noble on Counts IV and V. The cross-motions are fully briefed and ripe for disposition.

## II.   **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

Courts are permitted to resolve cross-motions for summary judgment concurrently. See Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. Fed. Express Corp., 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2015). When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion. FED. R. CIV. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

III.   **Discussion**

The facts in this case are largely undisputed.  Three predominantly legal questions remain: *first*, whether CNX and Noble breached the Lease when they assessed post-production costs on MAWC in general (Counts I and IV); *second*, assuming assessment of post-production costs was permissible, whether the actual costs lessees charged MAWC were appropriate and reasonable (Counts II and V); and *third*, whether lessees' reduction of royalty payments for post-production costs constituted conversion (Counts III and VI).  We will address these issues *seriatim*, noting any relevant differences between the parallel claims against CNX and Noble when necessary.

A.   **Breach of Contract – Post-Production Costs Generally**

MAWC contends that the general assessment of post-production costs by CNX and Noble was a breach of the Lease.  MAWC acknowledges that the Lease as written unambiguously permits lessees to deduct post-production costs, but posits that this right was either modified or waived by years of non-deduction preceding CNX's first assessment in November 2011.  MAWC alternatively asserts that lessees are equitably estopped from charging such costs.  CNX and Noble counter that there was no modification of the Lease because course of conduct alone cannot modify a contract, that there was no consideration for the purported modification, and that waiver and estoppel do not apply because there was no detrimental reliance.

1.    ***Modification and Waiver***[4]

Initially, we note that MAWC has ostensibly jettisoned its contract modification argument. As MAWC states, "the right to deduct [post-production] costs was not 'modified,' as this suggests the right continued in a modified form. Rather, the right to deduct costs was abandoned and waived in its entirety." (Doc. 142 at 1). This statement, while purporting to discard the modification claim, reflects a common problem that plagues the parties' arguments in this case: the conflation of material contract law terminology.[5] Accordingly, we will examine "modification" and "waiver" to clarify what these terms mean as well as to explain why MAWC's claims—no matter how they are cast—are unavailing.

A modification is "[a] change to something, an alteration or amendment." *Modification*, BLACK'S LAW DICTIONARY (10th ed. 2014). Modifying a contract effects a permanent change to the agreement's terms, essentially creating a new, substitute contract that incorporates the unchanged terms of the original agreement together with any amended provision. See Melat v. Melat, 602 A.2d 380, 385 (Pa. Super. Ct. 1992) (citing Knight v. Gulf Ref. Co., 166 A. 880, 882 (Pa. 1933)). Pennsylvania law recognizes that written contracts may be modified by subsequent written or oral

---

[4] MAWC uses "waiver" and "abandonment" interchangeably throughout its briefing. (See, e.g., Doc. 142 at 1, 4-5, 7, 9; Doc. 153 at 2-3). MAWC does not distinguish these terms or establish why they should be examined independently, and its amended complaint mentions only waiver. We therefore incorporate any argument regarding "abandonment" into our discussion of waiver.

[5] "An oil and gas lease is in the nature of a contract, and, thus, is controlled by principles of contract law." T.W. Phillips Gas & Oil Co. v. Jedlicka, 42 A.3d 261, 267 (Pa. 2012).

agreement—evidenced by words *or* conduct—if the subsequent agreement meets contract formation requirements and is supported by consideration or a legally sufficient substitute. Shedden v. Anadarko E. & P. Co., 136 A.3d 485, 490 (Pa. 2016); Kreutzer v. Monterey Cty. Herald Co., 747 A.2d 358, 362 (Pa. 2000).

Waiver, *per contra*, is "the intentional relinquishment of a known right." Stoner v. Stoner, 819 A.2d 529, 532 n.4 (Pa. 2003) (citation omitted); RESTATEMENT (SECOND) OF CONTRACTS § 84 cmt. b (AM. LAW INST. 1981). Waiver is an affirmative defense that is often asserted *against* a breach of contract claim. See, e.g., PA. R. CIV. P. 1030(a); FED. R. CIV. P. 8(c)(1); Reott v. Asia Trend, Inc., 55 A.3d. 1088, 1095 & n.6 (Pa. 2012). Waiver may be express or it may be implied by a party's unequivocal conduct demonstrating an intent to relinquish a known right. See Brown v. City of Pittsburgh, 186 A.2d 399, 401 (Pa. 1962); Camp Ne'er Too Late, LP v. Swepi, LP, 185 F. Supp. 3d 517, 550 (M.D. Pa. 2016) (citing Brown, 186 A.2d at 401).

Waiver of a contractual right is not necessarily permanent. For example, a party may waive a particular contractual right temporarily, but later retract that waiver and demand strict compliance with the provision going forward. See 13 WILLISTON ON CONTRACTS § 39:20 (4th ed. 1993); see also Daniels v. Phila. Fair Hous. Comm'n, 513 A.2d 501, 502-03 & n.3 (Pa. Commw. Ct. 1986) (citing RESTATEMENT (SECOND) OF CONTRACTS § 84(2)). This maxim is particularly applicable when the contract in question has a recurring or periodic obligation. See, e.g., Daniels, 513 A.2d at 502. Retraction of a waiver may nonetheless be impermissible if "the retraction would be unjust in light of a material change in position undertaken in

reliance on the waiver," *viz.*, detrimental reliance. 13 WILLISTON ON CONTRACTS § 39:20; <u>Daniels</u>, 513 A.2d at 502.

In the case *sub judice*, it is beyond peradventure that from January 2002 until October 2011, the various lessees, through their unequivocal conduct, impliedly *waived* their right to deduct post-production costs. By consistently remitting royalty payments and statements to MAWC that omitted any post-production charges, Dominion, CONSOL Gas, and (for a time) CNX intentionally relinquished their known right under the Lease to assess these costs. Were CNX and Noble seeking to claw back uncharged costs from MAWC for years past, they would likely be barred from doing so under the theory of implied waiver.

As this discussion reflects, what MAWC perceives as a prospective "waiver" or "abandonment" claim is, in fact, a modification argument. MAWC disclaims such an argument, maintaining that lessees' right to deduct post-production costs was not modified but rather omitted "in its entirety" from the Lease by waiver when the various lessees failed to charge these costs for nearly 10 years. (Doc. 142 at 1). This assertion, however, does not implicate waiver. MAWC is contending that the unambiguous right to deduct monthly post-production costs was not only intentionally relinquished in the past, but also has been lost forever going forward. Such allegations imply a *permanent* alteration or amendment to the Lease terms, which is, by definition, a modification.

The Rule 56 record does not support a claim of modification. MAWC has failed to establish that there was consideration, or a valid substitute, for the purported permanent alteration to the Lease. We reject MAWC's reliance on

Empire Properties, Inc. v. Equireal, Inc., 674 A.2d 297 (Pa. Super. Ct. 1996), which states that in the context of contract modification, "[c]onsideration is implied from the mutual assent of the parties to the modification." Empire Props., Inc., 674 A.2d at 302. We find this assertion to be logically unsound and directly contradicted by Pennsylvania Supreme Court precedent. Empire Properties collapses two distinct requirements for contract modification into one, *viz.*, instead of mutual assent *and* consideration, Empire Properties requires only mutual assent. This contravenes long-held Pennsylvania Supreme Court jurisprudence that a modification must be "supported by legally sufficient consideration, or a substitute therefor, *and* meet[] the requirements for contract formation." Shedden, 136 A.3d at 490 (emphasis added); Kreutzer, 747 A.2d at 362; Wilcox v. Regester, 207 A.2d 817, 821 (Pa. 1965). A district court in this circuit has recently repudiated Empire Properties for this exact reason. See Mikail v. PAM Mgmt., Inc., No. 3:15-CV-2437, 2017 WL 1344676, at *12 (M.D. Pa. Apr. 12, 2017) (Mannion, J.). Without consideration or a valid substitute, there can be no modification of the Lease.[6]

Nor has MAWC established the type of detrimental reliance that would prevent CNX and Noble from retracting their past waiver. To preclude retraction, MAWC would need to show that it materially changed its position in reliance on the non-deduction of post-production costs such that charging those costs going

---

[6] Some states have explicitly eliminated the need for consideration for contract modification beyond just in the sale of goods context. See, e.g., Cavalier Mfg. v. Clarke, 862 So. 2d 634, 640-41 (Ala. 2003); State v. D'Amico, 997 P.2d 773, 775 (Mont. 2000) (citing MONT. CODE ANN. § 28-2-1601). Pennsylvania is not one of them. See Shedden, 136 A.3d at 490.

forward would be "unjust."  13 WILLISTON ON CONTRACTS § 39:20; Daniels, 513 A.2d

at 502; RESTATEMENT (SECOND) OF CONTRACTS § 84(2).  MAWC is unable to make

such a showing.

MAWC admits that it was aware of the post-production cost deductions

beginning in late 2011 and factored them into its budgeting for fiscal year 2013

(April 1, 2012, through March 31, 2013) and all subsequent years.  (Doc. 143 ¶¶ 65-71;

Doc. 147 at 15-16; Doc. 144, Ex. 2, Ashton Dep. 87:5-11, 103:13-16; Doc. 144, Ex. 4,

Wasielewski Dep. 131:14-132:12).  MAWC contends that even though it knew about

and, in fact, planned for the deductions, it nevertheless suffered detriment in the

form of an estimated $800,000 in lost annual revenue from reduced royalties.  But

anticipated lower royalty revenues does not establish detrimental reliance.  MAWC

simply cannot show that it materially changed its position *in reliance on the non-*

*deduction of costs* when it specifically knew about the cost deductions and

incorporated them into its budget projections.  Accordingly, for fiscal years 2013

and later, there is no plausible argument that lessees' waiver retraction is barred by

detrimental reliance.

The only period in which MAWC could not have planned for post-production

cost deductions was fiscal year 2012, which ran from April 1, 2011, through March

31, 2012.  (See Ashton Dep. 103:17-21; Doc. 131 ¶ 17; Doc. 143 ¶ 17).  CNX did not

begin charging post-production costs until November 2011, halfway through the

fiscal year.  It is therefore possible that MAWC could prove detrimental reliance on

the non-deduction of costs if its actual gas royalties for 2012 fell below its

projections due to the unexpected deductions, thereby resulting in an unanticipated

revenue shortfall.  As MAWC has maintained, a revenue shortfall could result in, *inter alia*, higher borrowing costs and increased water and sewer rates for customers.  (Doc. 141 ¶¶ 67-70, 82-88).

MAWC, however, cannot demonstrate such harm.  Natural gas royalties are just one of numerous sources of revenue for MAWC's budget, the lion's share of which comes from water and sewer fees charged to its customers.  (See Doc. 141 ¶¶ 51, 82; Ashton Dep. 101:23-102:1).  Gas royalties constitute approximately five percent of MAWC's annual revenue and, in fiscal year 2012, represented an even smaller percentage.  (Ashton Dep. 18:21-19:8).  The record conclusively shows that MAWC's projected "other operating revenue"—which includes gas royalties—for fiscal year 2012 was $2,755,000.  (Id. at 104:15-105:17; Doc. 130, Ex. J at 2; Doc. 131 ¶ 18).  MAWC's actual "other operating revenue" for that year was $3,565,867— exceeding budget projections by almost a million dollars.  (Ashton Dep. 106:4-107:2; Doc. 130, Ex. J at 2; Doc. 131 ¶ 19).  The parties agree that actual "other operating revenue" outstripped projections due to the two new horizontal wells CNX began operating on the Lease property in mid-2011, which significantly increased gas

production and royalties above projected amounts.  (See Ashton Dep. 107:24-108:9;

Wasielewski Dep. 50:5-51:2; Doc. 143 ¶ 19).[7]

Receiving significantly *more* gas royalty revenue than forecast despite the

assessment of post-production costs does not implicate detrimental reliance.  In

other words, MAWC has not explained how it materially changed its position in

reliance on gas royalty projections that excluded post-production costs and then

suffered detriment based on that position.  Without being able to prove such

reliance, MAWC cannot show that lessees' prospective assessment of post-

production costs beginning in November 2011 (*i.e.*, retraction of their implied

waiver) is unjust.

---

[7] For fiscal year 2012, MAWC's *actual* gas royalties totaled $1,792,525, nearly all of which came from the Lease.  (Doc. 130, Ex. J).  MAWC asserts in its counterstatement to CNX's Local Rule 56(B)(1) statement that the *projected* line item for gas royalty revenue for fiscal year 2012 was $2,140,000.  (See Doc. 143 ¶ 18).  This $2.14 million figure is not supported by MAWC's citation to the record and is directly contradicted by the following paragraph in which MAWC avers, "*actual* [other] operating revenue for fiscal year 2012 was higher because the gas royalty revenue line item of that category *was higher than originally budgeted for*, because more deep wells came on line and started producing during that time period *than what the MAWC had anticipated when it originally projected the revenues for that line item when it budgeted for fiscal year 2012*."  (Doc. 143 ¶ 19 (emphasis added)).  Furthermore, it appears unlikely that MAWC would project gas royalty revenue of $2.14 million for fiscal year 2012—that number is approximately 400 to 500 percent higher than previous years and exceeds the *total* "other operating revenue" received for fiscal year 2011.  (See Doc. 130, Ex. H at 1; Doc. 130, Ex. I at 1-2; Doc. 130, Ex. J at 2).  MAWC, moreover, admits that it did not anticipate that the deep horizontal wells would come on line in mid-2011 and produce such large quantities of gas and related royalties.  (See Ashton Dep. 107:24-108:9; Wasielewski Dep. 50:5-51:2; Doc. 143 ¶ 19).  Hence, we find that MAWC has failed to support its assertion that projected gas royalty revenues for fiscal year 2012 were $2.14 million.

## 2.   *Equitable Estoppel*

MAWC also asserts equitable estoppel in support of its breach of contract claims in Counts I and IV.  Under the theory of equitable estoppel applicable to contracts, a party's conduct may modify an existing contract if: (1) the conduct induces another contracting party to act in a manner contrary to the agreement's terms, and (2) the other party justifiably relies on this conduct to its detriment.  See Kreutzer, 747 A.2d at 362.

MAWC's claim of equitable estoppel suffers from the same infirmities as its argument of "permanent waiver."  Specifically, MAWC cannot establish justifiable detrimental reliance on the conduct of lessees or their predecessors-in-interest to claim that the contract was modified and no post-production costs can ever be charged in the future.  From the foregoing discussion, it is obvious that MAWC could not have justifiably relied to its detriment on CNX and Noble continuing to waive their contractual right to charge post-production costs.  Lessees retracted that waiver beginning in November 2011, and MAWC incorporated the deductions into its budget projections beginning in fiscal year 2013.  For fiscal year 2012, as explained above, MAWC cannot demonstrate detrimental reliance on the non-deduction of costs when its actual gas royalty revenues, even with the deductions, exceeded its budget projections.

MAWC has failed to carry its burden at summary judgment—as movant or nonmovant—on its claims of breach of contract concerning the general deduction of post-production costs from royalties.  The Lease explicitly permits assessment of such costs, and MAWC has not adduced adequate evidence to sustain a judgment in

its favor on its claims of modification, waiver, or equitable estoppel. We will grant summary judgment in favor of CNX and Noble on Counts I and IV.

**B.      Breach of Contract – Improper, Unreasonable, or Excessive Costs**

MAWC alternatively argues that CNX and Noble breached the Lease by charging post-production costs that were unreasonable, excessive, or for services not provided. MAWC claims that both lessees charged an excessive gathering fee that failed to take into account that MAWC's wells produced only "dry" natural gas, which is less expensive to bring from wellhead to market than "wet" gas.[8] MAWC also contends that Noble improperly charged MAWC for electricity that was never actually used in the post-production process for gas produced under the Lease.

Before addressing these claims, we find it necessary to provide additional factual background. On September 30, 2011, the same day that CNX and Noble commenced their joint operations, they entered into identical gas gathering agreements ("2011 Gathering Agreements") with CONE Gathering LLC ("CONE Gathering"). (Doc. 126 ¶¶ 15, 19). CONE Gathering was formed by Noble and CNX's corporate parent, CONSOL Energy, with CONSOL Energy and Noble each owning a 50 percent interest. (Id. ¶ 15). CONE Gathering was created primarily to

---

[8] "Dry" natural gas is "gas that occurs in the absence of condensate or liquid hydrocarbons . . . or has had condensable hydrocarbons removed." (Doc. 127-1, Ex. 8 at 7). "Wet" natural gas is "gas that contains less methane (typically less than 85% methane) and more ethane and other more complex hydrocarbons." (Id.) Gathering wet gas typically is more expensive than gathering dry gas, as wet gas requires more compression and processing. (Doc. 126 ¶¶ 25-29; Doc. 127, Ex. 4, Fink Dep. 260:25-264:5). All natural gas produced under the Lease is dry gas. (Doc. 126 ¶ 30).

gather Marcellus Shale gas produced by CNX and Noble under their joint operating agreement. (Id. ¶ 16; Doc. 148 at 4 ¶ 16, Doc. 151 ¶ 16; Fink Dep. 121:11-21). CONE Gathering acquired the gathering system that CNX had previously acquired and developed. (Doc. 126 ¶ 17; Doc. 148 at 4 ¶ 17; Doc. 151 ¶ 17). Under the 2011 Gathering Agreements, CONE Gathering charged both CNX and Noble a gathering fee of $0.46 per one million British thermal units ("MMBtu") for all gas gathered, regardless of whether it was wet or dry. (Doc. 126 ¶ 32).

In May 2014, CONSOL Energy and Noble formed CONE Midstream Partners LP ("CONE Midstream") for the same primary purpose as CONE Gathering. (Id. ¶ 20; Doc. 127-1, Ex. 8 at 9). CONE Midstream acquired the gathering system that CONE Gathering had originally acquired from CNX, along with a few additional assets. (Doc. 126 ¶ 21; Doc. 148 at 5 ¶ 21; Doc. 151 ¶ 21). Ownership of CONE Midstream appears to be as follows: CONSOL Energy – 32.1% limited partner interest; Noble – 32.1% limited partner interest; Public Unitholders (20,125,000 common units) – 33.8% limited partner interest; CONE Midstream GP LLC (CONE Midstream's "general partner") – 2% general partner interest. (Doc. 127-1, Ex. 8 at 10). On September 30, 2014, CNX and Noble entered into identical gas gathering agreements ("2014 Gathering Agreements") with CONE Midstream that replaced the 2011 Gathering Agreements. (Doc. 126 ¶ 22). The 2014 Gathering Agreements charge separate gathering fees for wet and dry gas: $0.40 per MMBtu for dry gas and, except for one specific area in West Virginia, $0.55 per MMBtu for wet gas. (Doc. 126 ¶¶ 35-37).

### 1.    *Improper Gathering Fee – CNX and Noble*

The gravamen of MAWC's claims regarding the gathering fee is that charging $0.46 per MMBtu for MAWC's dry gas was improper and excessive.  According to MAWC, that fee did not delineate between wet and dry gas gathering and did not account for the fact that all gas produced under the Lease was dry, resulting in MAWC being charged "a processing fee [for wet gas] that was *never incurred.*" (Doc. 142 at 19-20).  Lessees counter that MAWC has not satisfied its burden at summary judgment because it has failed to adduce affirmative evidence that the $0.46 per MMBtu gathering rate was unreasonable.

MAWC marshals the following evidence in support of its claim.  First, the 2014 Gathering Agreements materially changed the fee structure by separating wet and dry gas gathering charges.  MAWC contends that this change indicates that the prior assessment of a single, "blended" fee necessarily included wet gas processing costs, resulting in MAWC being assessed for costs that were not incurred under the Lease.  Lessees dispute that "blended" connotes that the fee was an average of wet and dry gas gathering costs.  They instead posit that the term means only that the same fee was charged for gathering wet gas as was charged for gathering dry gas because when CONE Gathering formed it did not have the "operating history that would provide a basis for differentiating" the charges.  (See Doc. 148 at 6-8 ¶¶ 33-36, 38-39; Doc. 151 ¶¶ 33-36, 38-39).  However, the testimony of Joseph Fink ("Fink")—Vice President of Midstream Operations for CONSOL Energy and corporate designee for CONE Gathering and CONE Midstream—supports MAWC's interpretation that the $0.46 rate was determined by averaging a more expensive

wet gas fee with a cheaper dry gas fee.  (See Fink Dep. 10:6-8, 48:15-49:18, 286:9-287:4; 296:17-298:21).  In particular, when asked whether the $0.46 rate was "arrived at" by averaging wet gas and dry gas gathering costs, Fink responded affirmatively that "46 cents was *a blend of wet and dry*."  (Id. at 298:5-18 (emphasis added)).  This phrasing implies an average, not a single rate being applied indiscriminately to each type of gathering due to lack of historical expense data.[9]

MAWC also underscores that CONE Gathering was owned entirely by CONSOL Energy—CNX's parent company—and Noble.  According to MAWC, the 2011 Gathering Agreements and the fees they established were not "arm's-length" deals because, in negotiating with CONE Gathering, CNX and Noble were essentially bargaining with themselves.  MAWC cites Fink's admission that the 2011 Gathering Agreements were created not through arm's-length negotiation between adversaries but through a "collaborative effort" between parties with a "shared interest."  (Fink Dep. 251:12-253:21).  Lessees counter that just because the 2011 Gathering Agreements involved affiliates does not mean that the terms were *per se* unreasonable.  This is obviously true, but misses MAWC's point, which is simply that the structure and ownership interests of CONE Gathering may further

---

[9] We find unpersuasive lessees' contention that lack of historical operating information for CONE Gathering inoculates the flat $0.46 gathering fee.  The parties who formed CONE Gathering and participated in drafting the 2011 Gathering Agreements—CONSOL Energy, CNX, and Noble—are large, experienced natural gas companies.  (See, e.g., Doc. 127-1, Ex. 8 at 3, 9, 13).  Common sense dictates that these companies entered the gathering agreement negotiation process with some knowledge as to typical natural gas gathering fees and the propriety of charging a single gathering fee for both wet and dry gas.

demonstrate that the $0.46 "blended" rate charged by lessees was improper.  See Owen L. Anderson, *Calculating Royalty: "Costs" Subsequent to Production – Figures Don't Lie, But . . . .*, 33 WASHBURN L.J. 591, 597, 601-04 (1994).

We reject lessees' argument that they were merely passing on the gathering fee they themselves were charged by CONE Gathering and therefore the costs were, *ipso facto*, "actually incurred." (See, e.g., Doc. 120 at 16, 17; Doc. 147 at 6; Doc. 148 at 6-7 ¶¶ 32-35).  That CONE Gathering charged lessees a single gathering fee of $0.46 per MMBtu covering *all* leases under the joint operating agreement does not mean that charging MAWC such a fee was reasonable or proper.  If CNX and Noble are going to reduce MAWC's royalties by assessing a *pro rata* share of a particular category of post-production costs—like dehydration, compression, processing, transportation, etc.—at the very least that *category* of costs must have actually been incurred with respect to gas produced under the Lease.  See Wellman v. Energy Res., Inc., 557 S.E.2d 254, 265 (W. Va. 2001); Nami Res. Co. v. Asher Land & Min., Ltd., 554 S.W.3d 323, 332-34 (Ky. 2018).  Lessees likely incurred post-production costs for processing wet gas from leased properties situated in wet-gas regions. Nevertheless, neither CNX nor Noble has identified any authority, binding or persuasive, that would permit them to average wet and dry gas gathering costs and proportionately distribute them to every lessor regardless of whether the lessors' wells produced wet or dry gas.

We conclude that MAWC has proffered sufficient evidence to create a genuine dispute of material fact on its breach of contract claim regarding the $0.46 gathering fee.  A reasonable jury could find that lessees—through their blended fee

assessment—improperly charged MAWC for wet gas processing, thereby assessing a post-production cost that was not "actually incurred" under the Lease.

## 2. *Improper Electricity Costs – Noble*

MAWC likewise asserts that Noble wrongfully charged MAWC $241,200 for electricity costs that were not incurred for gas produced under its Lease. According to MAWC, the only permissible electricity charge under the gathering agreements was electrical compression, all compression for MAWC's gas was powered by natural gas, and therefore Noble's charges for electricity were unnecessary and improper. Noble rejoins that it was charged for electricity costs by CONE Gathering and CONE Midstream and thus it was proper and reasonable to pass on MAWC's *pro rata* share of those post-production expenses. Noble also asserts that there were other electricity costs—beyond compression—involved in the post-production of gas under the Lease, including "pumps, lights, [and] control systems." (Doc. 158 at 18 (quoting Fink Dep. 355:7-356:4)).

We find that a genuine dispute of material fact precludes summary judgment on this claim. MAWC has proffered substantial evidence that all compression for gas produced under the Lease was powered by natural gas, not electricity. (See, e.g., Fink Dep. 45:14-46:4, 180:4-9; Mumford Dep. 244:6-17). At minimum, it is likely that the *pro rata* electricity costs Noble charged MAWC included electrical compression expenses incurred in gathering gas from other leases under the joint operating agreement. (See Doc. 127-1, Ex. 7, Nedelka Dep. 74:20-75:23; 81:16-82:21). We again reject the argument that Noble was merely apportioning costs charged to it: that the CONE entities charged electricity costs to Noble associated with all

leases does not necessarily permit Noble to then apportion that cost to every leaseholder without regard to whether the property in question actually incurred that type of cost.[10] <u>Wellman</u>, 557 S.E.2d at 265; <u>Nami Res. Co.</u>, 554 S.W.3d at 332-34. On the other hand, Noble has proffered evidence that electricity was used for purposes beyond compression in the post-production process for MAWC's gas. (<u>See</u> Fink Dep. 355:7-357:9). If those costs were actually incurred for MAWC's gas and were part of the electricity charges Noble assessed on MAWC, they arguably would be chargeable under the Lease.

The Rule 56 record is unclear about the composition of the electricity charges Noble assessed on MAWC. There is conflicting evidence regarding whether the electricity costs constituted electrical compression only or whether they included other electrical expenses. Initially, we disagree with MAWC that the 2011 and 2014 Gathering Agreements *per se* foreclose assessment of electricity charges on MAWC by Noble for any purpose other than compression. MAWC is not a party to those contracts; rather, the assessment of post-production costs by lessees on MAWC is governed by the terms of the Lease.

To be clear, we do not foreclose the gathering agreements as evidence of the propriety of the electricity charges Noble assessed. Noble avers that the invoices the gathering companies sent to it included an electricity charge line item for "Section 5.3 Electrical Compression," referring to the 2011 Gathering Agreement,

---

[10] We note that it appears that CNX did not charge MAWC for electricity costs.

and "Electrical Compression Charge," apparently referencing Section 5.2(D) of the 2014 Gathering Agreement.  (Doc. 151 ¶ 48).  Noble acknowledges that the gathering companies "charged Noble for 'electrical compression,' and Noble in turn deducted [MAWC]'s pro rata share of that charge from [MAWC]'s royalties."  (Id. ¶ 53).  This evidence implies that the gathering companies charged Noble only for electrical compression and that this was the sole electricity expense passed on to MAWC.

Assuming *arguendo* that (1) CONE Gathering and CONE Midstream charged Noble for electricity *only* for compression purposes, (2) this was the lone electricity charge Noble passed on to MAWC, and (3) none of MAWC's gas was produced using electrical compression, it is likely that Noble wrongfully assessed electricity charges on MAWC because that category of cost was not actually incurred under the Lease. Nonetheless, because the record is unclear as to the composition and proportions of the electricity charges at issue, summary judgment on this claim is inappropriate for either Noble or MAWC.  We will therefore deny the parties' cross-motions for summary judgment on Counts II and V.

### C.    Conversion

MAWC also raises claims of conversion in relation to lessees' deduction of post-production costs from MAWC's royalties.  CNX and Noble move for summary judgment, contending that these tort claims are merely recast breach of contract claims and thus barred by the gist of the action doctrine.  We agree with lessees.

Under the gist of the action doctrine, a contracting party cannot assert a tort claim against another party to the contract when the gravamen of such a claim is, in actuality, breach of contract.  Bruno v. Erie Ins. Co., 106 A.3d 48, 68 (Pa. 2014).

When distinguishing between tort and breach of contract claims, the determinative factor is "the nature of the duty alleged to have been breached[.]" Id. at 68-69. If the duty is created by the terms of the parties' agreement, then the claim sounds in breach of contract; if it derives from a defendant's "broader social duty owed to all individuals," the claim must be regarded as a tort. Id. at 68. Stated differently, if the duty asserted is based on "a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract," then the claim is for breach of contract. Id. If, on the other hand, the duty alleged to have been breached stems from a broader social duty owed to all individuals beyond just the contracting parties and is imposed by tort law, then the claim is properly considered a tort. Id.

Claims for conversion that are related to breach of contract claims are not inherently foreclosed by the gist of the action doctrine. The question is whether the conversion claim arises from breach of a contractual duty or whether it is grounded in tort law. See id. at 68-69. Several cases which MAWC cites in support, although clearly distinguishable from the case sub judice, helpfully illustrate how breach of contract and related conversion claims can harmoniously coexist.

In Integrated Waste Solutions, Inc. v. Goverdhanam, No. 10-CV-2155, 2010 WL 4910176 (E.D. Pa. Nov. 30, 2010), plaintiff asserted, inter alia, that defendants had breached a confidentiality agreement and also wrongfully converted intellectual property that was the subject of that agreement. Goverdhanam, 2010 WL 4910176, at *13-14. Likewise, in Orthovita, Inc. v. Erbe, No. 07-CV-2395, 2008 WL 423446 (E.D. Pa. Feb. 14, 2008), plaintiff sued a former employee on various

theories, including breach of a confidentiality provision in his employment contract and conversion of confidential intellectual property. Orthovita, Inc., 2008 WL 423446, at *1-3. Both defendants asserted a gist of the action defense, positing that the conversion claim was subsumed by the contractual claim. Goverdhanam, 2010 WL 4910176, at *9; Orthovita, Inc., 2008 WL 423446, at *4. The court in both cases disagreed, finding that the plaintiffs had independent property interests in the confidential information and the conversion claims were grounded in the broader and extra-contractual social duty to refrain from unlawfully taking another's personal property for personal gain. See Goverdhanam, 2010 WL 4910176, at *14; Orthovita, Inc., 2008 WL 423446, at *6.

MAWC's conversion claims are easily distinguishable from both cases. MAWC asserts that CNX and Noble, by deducting and withholding post-production costs unreasonably or in contravention of the Lease, converted portions of MAWC's royalties. The duties MAWC alleges lessees violated, however, derive entirely from the parties' contract. Lessees would not have the obligation to pay gas royalties (with or without assessing post-production costs) or to deduct only reasonable costs but for the existence of the Lease. MAWC inadvertently emphasizes this fact in its amended complaint, as its conversion claims simply cross-reference the contractual duties lessees allegedly violated when reducing MAWC's royalties. (See Doc. 50 ¶¶ 76, 99).

MAWC contends that it has a property interest in gas royalties and that "[a] party to a contract can sue for both breach of contract and conversion when the plaintiff has a property interest in the thing converted" even though that property is

also the subject of a contract.  (Doc. 142 at 24-25 (emphasis omitted) (citing <u>Synthes,</u>

<u>Inc. v. Emerge Med., Inc.</u>, No. 11-CV-1566, 2012 WL 4205476, *12 (E.D. Pa. Sept. 19,

2012)).  Yet the only way that MAWC could have a property interest in the royalties

withheld by lessees is if—pursuant to the Lease—lessees had wrongfully deducted

those costs.  "[A] claim of conversion cannot be sustained in the face of lawful

justification on the part of the asserted tortfeasor."  <u>Pioneer Commercial Funding</u>

<u>Corp. v. Am. Fin. Mortg. Corp.</u>, 855 A.2d 818, 827 (Pa. 2004) (citing <u>Stevenson</u>

<u>v. Econ. Bank of Ambridge</u>, 197 A.2d 721, 726 (Pa. 1964)).  When entitlement to the

property at issue is predicated solely on the terms of a contract, the gist of the

action doctrine will bar a conversion claim for that property.  <u>Rahemtulla</u>

<u>v. Hassam</u>, 539 F. Supp. 2d 755, 777 (M.D. Pa. 2008) (collecting cases); <u>see</u> <u>also</u>

<u>Bancroft Life & Cas., ICC, LTD. v. Lo</u>, 978 F. Supp. 2d 500, 520-21 (W.D. Pa. 2013).

MAWC's entitlement to the withheld royalties, and thus its theory of conversion,

depends entirely on the terms of the Lease.  Consequently, we are compelled to

grant lessees' motion for summary judgment on Counts III and VI pursuant to the

gist of the action doctrine.

## IV.    <u>Conclusion</u>

We will grant the summary judgment motions filed by CNX and Noble as to Counts I, III, IV, and VI of the amended complaint and deny the motions as to Counts II and V.  We will deny MAWC's motion for partial summary judgment in its entirety.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    March 29, 2019